FILED

03/16/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0347

DA 20-0347

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 66

IN THE MATTER OF:

D.D.,

     A Youth in Need of Care.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DN 18-02
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Taryn Gray, Driscoll Hathaway Law Group, Missoula, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

        Kathryn McEnery, Powell County Attorney, Deer Lodge, Montana

Submitted on Briefs:  February 10, 2021

Decided:  March 16, 2021

Filed:

_____
                   Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 D.D. (Father), father of D.D. (Child), appeals from the June 4, 2020 Order Terminating Father's Parental Rights and Granting Permanent Legal Custody issued by the Montana Third Judicial District Court, Powell County, which terminated his parental rights to Child.

¶2 We restate the issues on appeal as follows:

*1. Whether the District Court's failure to obtain a written confirmation directly from the Tribe regarding Child's enrollment eligibility constitutes reversible error.*

*2. Whether the District Court erred in terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA.*

¶3 We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4 The Montana Department of Health and Human Services, Child and Family Services Division (Department) became involved when Child was born March 16, 2018, and tested positive for marijuana. Initially, the Department entered into an in-home safety plan with T.S. (Mother) whereby she would reside with Child in her father's (Grandfather) home. This plan was unsuccessful as Mother stayed only one night in Grandfather's home before returning to reside with Father. Additionally, Father refused to sign the in-home safety plan. The Department filed its petition for emergency protective services (EPS), show cause, adjudication, and temporary legal custody (TLC) on April 25, 2018, asserting concerns of drug use by the parents and domestic violence on Father's part.

2

¶5 Although Father initially arrived at the courthouse prior to the show cause hearing on May 15, 2018, he left on advice of his counsel as he was too upset to remain and participate. Father did, however, contest EPS and adjudication. The Department then presented evidence as to the following: Mother initially presented to the Anaconda Community Hospital for delivery of Child. At the hospital, Father made quite a scene storming out of the delivery room, yelling, banging on doors, and punching walls.[1] After Child's birth, Mother and Child were transferred to the Missoula hospital. Upon Father's arrival there, a similar scene ensued when a charge nurse asked Father if he was sick and when he replied that he was, she related he could not be there. Father then began yelling, swearing, and slapping walls as he left. Child Protection Specialist (CPS) Sandy Cisneros testified to concerns about Father's violence based on his erratic and aggressive behaviors at the hospitals and Mother's report of violence against her during the relationship. CPS Cisneros also testified to concerns regarding the parents use of drugs with Father testing positive for marijuana and benzodiazepine on April 19, 2018. Finally, CPS Cisneros testified although she met with Father after the Department filed its petition and he indicated a desire to work with the Department, she had not had much contact with Father. At the conclusion of the hearing, the District Court found EPS to be warranted, adjudicated

---

[1] Apparently, Father was requested to leave the delivery room. He left yelling and punching walls as he went. As per Grandfather's girlfriend, he returned after Child was born and while sitting on a waiting room couch told a nurse he had a deathly flu. The nurse advised he wear a mask and keep the visit limited. Father then demanded to be swabbed for the flu and the nurse referred him to the ER for that. Father then blew up, started kicking the garbage can, and then left. After he left, law enforcement arrived.

Child as a youth in need of care (YINC), and granted the Department TLC for a period of six months.

¶6    The District Court held a treatment plan hearing on June 29, 2018. Father's treatment plan—signed by him, his counsel, CPS Linda Huffaker, the Department's counsel, Child's attorney, and the guardian ad litem—was presented to and approved by the court. Following approval of his treatment plan, Father for the most part disengaged and did not appear at further court proceedings until his termination hearing. Father did not successfully complete any of the agreed tasks of his treatment plan. Specifically, Father failed to obtain a chemical dependency evaluation with a Department-approved evaluator. Father failed to obtain a mental health evaluation with a provider approved by the Department. Father failed to engage in drug testing with providers referred by the Department with some positive tests and several "no shows." Father failed to complete an approved parenting class. Father failed to maintain consistent visits with Child seeing him less than a dozen times over a two-year period. Father failed to maintain contact with the Department. Father failed to maintain contact with his counsel. Father failed to remain law abiding and was convicted of a second Partner or Family Member Assault (PFMA) during the pendency of the case and was then revoked and removed from pre-release. Father failed to maintain safe and stable housing and, at the time of the termination hearing, Father was incarcerated and only at the outset of participation in the Sanction, Treatment, Assessment, Revocation, and Transition (START) program.

¶7 On February 20, 2020, the Department filed its petition to terminate Father's parental rights asserting termination pursuant to § 41-3-609(1)(f), MCA—failure to successfully compete his court-ordered treatment plan combined with lack of likelihood of successful change within a reasonable time—was warranted. Following the termination hearing on May 15, 2020, the District Court issued its Order Terminating Father's Parental Rights and Granting Permanent Legal Custody on June 4, 2020, finding Child was previously adjudicated a YINC, Father failed to successfully complete his treatment plan, and the conduct or conditions rendering Father unfit, unable, or unwilling to parent were unlikely to change in a reasonable time.

¶8 Father raises two issues on appeal: whether the Department failed to obtain conclusive determination regarding Child's enrollment eligibility with the Turtle Mountain Band of Chippewa Tribe (Tribe) and whether the District Court erred in concluding that continuation of the parent-child relationship would result in continued abuse or neglect and that Child's best interests were served by terminating Father's parental rights.

**STANDARDS OF REVIEW**

¶9 We review a district court's decision to terminate parental rights for an abuse of discretion, considering the applicable standards of Title 42, chapter 3, MCA, and the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963. *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586. A court abuses its discretion if it terminates parental rights based on clearly erroneous findings of fact, erroneous conclusions of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of

5

reason resulting in substantial injustice. *In re D.E.*, ¶ 21 (citing *In re D.B.*, 2007 MT 246, ¶ 18, 339 Mont. 240, 168 P.3d 691). Findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or this Court has a definite and firm conviction that the lower court was mistaken. *In re D.E.*, ¶ 21 (citing *In re D.H.*, 2001 MT 200, ¶ 14, 306 Mont. 278, 33 P.3d 616). We review conclusions of law for correctness. *In re D.E.*, ¶ 21.

## DISCUSSION

¶10    *1. Whether the District Court's failure to obtain a written confirmation directly from the Tribe regarding Child's enrollment eligibility constitutes reversible error.*

¶11    ICWA and § 41-3-609, MCA, impose different standards for termination of parental rights depending on whether a child is an "Indian child," therefore whenever the court has reason to believe that the child is an Indian child as defined by ICWA, district courts must first verify the Indian or non-Indian status of a child prior to the termination hearing. *In re D.E.*, ¶ 24 (citations omitted). The question of whether a child is eligible for tribal membership is, except where limited by federal statute or treaty, in the sole power of the tribes. *In re D.E.*, ¶ 25 (citing *In re A.G.*, 2005 MT 81, ¶ 13, 326 Mont. 403, 109 P.3d 756). When a court has reason to believe a child may be an Indian child, proceeding to termination without a conclusive tribal determination of tribal membership or eligibility is an abuse of discretion. *In re D.E.*, ¶ 25. 25 U.S.C. § 1914 allows "any parent . . . from whose custody [an Indian] child was removed" to "petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any

6

provision of [25 U.S.C. §§ 1911, 1912, and 1913]." 25 U.S.C. § 1914. Upon such a showing, "the court must determine whether it is appropriate to invalidate the action." 25 C.F.R. § 23.137(b) (2020). "This rule does not require the court to invalidate an action, but requires the court to determine whether it is appropriate to invalidate the action under the standard of review under applicable law." *In re S.B.*, 2019 MT 279, ¶ 28, 398 Mont. 27, 459 P.3d 214 (internal quotation marks omitted); *see also* Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act* 76 (Dec. 2016), https://perma.cc/2JZM-YAUZ. 25 U.S.C. § 1912(a) requires the Department provide an Indian child's tribe notice of proceedings to place an Indian Child in foster care or terminate the parental rights to the Indian child at least ten days before any hearing. *In re S.B.*, ¶ 32; *see also* 25 C.F.R. § 23.111 (2020). The Department must provide notice "by registered or certified mail with return receipt requested," and "the court must ensure that . . . [a]n original or a copy of each notice sent under this section is filed with the court together with any return receipts or other proof of service." 25 C.F.R. § 23.111(a)(2), (c); *In re S.B.*, ¶ 32. We have explained, however, that "ICWA's notice requirements are not jurisdictional and are subject to harmless error review." *In re S.B.*, ¶ 32 (quoting *In re M.S.*, 2014 MT 265A, ¶ 22, 376 Mont. 394, 336 P.3d 930). "An error involving notice to a tribe is not ground for reversal unless there is a reasonable probability that the appellant would have obtained a more favorable result in the absence of the error." *In re S.B.*, ¶ 32 (quoting *In re M.S.*, ¶ 22).

¶12 Here, Father does not assert Child is actually an Indian child or that ICWA applies, but rather asserts the Department did not file a written document from the Tribe confirming Child was not an Indian child. In early 2019, presumably based on information that Grandfather was an enrolled member of the Tribe, the Department sent a letter to the Tribe to find out if Mother was eligible for enrollment and to notify the Tribe about the proceedings. Within two months, the Department received confirmation Mother was not eligible for enrollment, confirming Child was also not eligible for enrollment and was, thus, not an Indian child. The Department notified the parties and the court of this confirmation through its May 24, 2019 Petition to Extend TLC and supporting affidavit.[2] Further, CPS Amy Pearson testified ICWA did not apply to this case at the termination hearing. Father failed to object to the sufficiency of the Department's confirmation, did not object to CPS Pearson's testimony, or assert at the District Court level—or on appeal— that ICWA applied. As Father did not raise this issue below, he must first convince us that failure to review the error may result in a manifest miscarriage of justice or may compromise the integrity of the judicial process and, if so, that Father would have obtained a more favorable result in the absence of the error. *In re S.C.*, 2005 MT 241, ¶ 35, 328 Mont. 476, 121 P.3d 552 (citation omitted); *In re S.B.*, ¶ 32. Given the circumstances

---

[2] The Petition stated: "The Department has contacted the ICWA Coordinator with the Turtle Mountain Band of Chippewa Indians and received confirmation that although the maternal grandfather has a blood quantum of 41/128 (about 1/3), the child's mother does not meet the [1/4] blood quantum minimum requirement for enrollment eligibility and neither does the subject child." The CPS supporting affidavit averred, "to the best of my knowledge and belief, [Child] is not [an] Indian Child[] Subject to the Indian Child Welfare Act."

present here, Father has not demonstrated the District Court's failure to require the Department to file a different written confirmation from the Tribe resulted in a manifest miscarriage of justice, compromised the integrity of the legal process, or would have resulted in a more favorable outcome in the absence of the asserted error. Thus, under the facts presented, lack of written documentation from the Tribe did not create reversible error.

¶13    2.    *Whether the District Court erred in terminating Father's parental rights pursuant to § 41-3-609(1)(f), MCA.*

¶14    Father first asserts that the presumption favoring termination set forth in § 41-3-604(1), MCA, does not apply as Child was placed in kinship care. There is nothing in the District Court's termination order indicating it applied or imposed any presumption under § 41-3-604(1), MCA. Accordingly, we do not address Father's assertion in this regard.

¶15    Next, Father asserts the District Court erred in concluding continuation of the parent-child relationship would result in continued abuse and neglect and that termination was in Child's best interests. Father reasons that since Child has successfully been reunified with Mother, Child has, in essence, achieved permanency and no longer faces abuse or neglect by Father. Father asserts the Department confused its role in advocating for Mother in pursuing termination of Father's parental rights to circumvent the proper legal process of Mother and Father engaging in a separate parenting action to establish and implement a parenting plan setting forth the rights and responsibilities of each to and

9

regarding Child. Father asserts the Department's role in this case was merely to ensure Child had a safe and appropriate home to return to with Mother.[3]

¶16    A court may terminate parental rights when (1) a child has been adjudicated as a YINC; (2) an appropriate treatment plan approved by the court has not been complied with by the parent or has not been successful; and (3) the conduct or condition of the parent rendering him or her unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Each factor must be supported by clear and convincing evidence. Section 41-3-609(1), MCA. In determining whether the conduct or condition of the parent is likely to change within a reasonable time, "the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parent[] renders the parent[] unfit, unable, or unwilling to give the child adequate care." Section 41-3-609(2), MCA. In making this determination, the court must at least consider: "(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time; (b) a history of violent behavior by the parent; (c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for

---

[3] Father asserts termination of his parental rights with regard to Child cannot be in Child's best interests because the Department did not intervene with regard to a second child, H.D.,—born to he and Mother during the pendency of this cause—and his parental rights have not been terminated in relation to H.D. Father asserts there is a parenting plan in place between he and Mother with regard to H.D. and that a parenting plan could adequately protect Child without termination of his parental rights.

10

the child; and (d) present judicially ordered long-term confinement of the parent." Section 41-3-609(2)(a)-(d), MCA.

¶17    The District Court terminated Father's parental rights pursuant to § 41-3-609(1)(f), MCA, finding Child was a YINC, Father failed to complete an appropriate treatment plan, and the conduct or conditions rendering Father unfit, unable, or unwilling to give adequate parental care were unlikely to change within a reasonable time. The District Court additionally found that continuation of the "legal relationship between Father and Child will likely result in continued abuse and neglect, and is no longer in the best interest of the child to continue to work towards reunification with Father, as is more particularly described in [CPS Pearson's] Affidavit." CPS Pearson's Affidavit in support of the termination petition, details Father's conduct and conditions within the framework of § 41-3-609(2)(a)-(d), MCA, and comprehensively describes his lack of any meaningful progress during the entirety of this case.[4]

---

[4] Specifically, she notes Father failed to successfully complete any of his treatment plan tasks and has not demonstrated any progress in meeting any of the treatment plan goals. She notes Father continues to exhibit mental health deficiencies with emotional lability common with untreated mental health concerns of a duration that renders him unlikely to care for Child's physical, mental, and emotional needs. She notes Father's history of violent behavior with two PFMA convictions in addition to an assault conviction and his periodic incarcerations during the case. She notes Father's excessive use of alcohol or drugs with continued use of methamphetamine and marijuana during the entirety of the case. She notes Father's present judicially ordered confinement, having been revoked and sentenced on November 5, 2019, to two years at the Montana Department of Corrections, none suspended, with recommendation for drug treatment. Finally, she notes it unlikely Father will change within a reasonable time as he has repeatedly demonstrated an inability to self-regulate and conduct himself in a safe and appropriate manner.

¶18     We agree with Father that it is not the role of the Department to advocate for one parent to circumvent parents' obligations under Title 40, MCA, to establish and enforce their own parenting plans. While Father is correct that the Department could have elected to require Mother to obtain a suitable parenting plan, reunify Child with Mother, and dismiss the action; under the particular circumstances of this case, the Department was not required to do so. From our review of the record, it is apparent Father was abusive to Mother during their relationship. When Mother had opportunity to successfully engage in an in-home safety plan, Father refused to involve himself with such. Rather than engage in the in-home safety plan by residing with Child and Grandfather, within a day Mother returned to reside with Father. There is no indication Father did anything to put Child's needs ahead of his own to dissuade Mother from returning to his residence. Mother has exhibited dependency features, demonstrating difficulty in standing up to Father without considerable assistance from others. Father's contentious and antagonistic behaviors toward Mother continued to the extent Father was unable to focus on his own relationship with Child and refrain from these behaviors towards Mother and visitation staff during Child visits. As a result, the Department had to terminate joint visits. Thereafter, Father made no sincere attempt to reinstate his visits or have any ongoing contact with Child. Father has not demonstrated an ability to maintain emotional regularity such that throughout the entirety of the case he failed to productively interact with Mother, the Department, his attorney, or the court. Father's therapist advised CPS he needed extensive, long-term therapy for any effective change to take place, but he took no meaningful steps

12

to engage in ongoing mental health services and has made no meaningful progress in this regard. Father has not demonstrated a period of sobriety for any meaningful period of time and continued to engage in criminal activity. His emotional dysregulation then complicated his legal problems resulting in revocation of a suspended sentence and then termination from pre-release. At the time of the termination hearing, Father was at the outset of participation in the START program. Father has basically shown little to no interest in addressing his parenting deficiencies but instead has relied upon Mother to regain custody in order to protect his parental rights.

¶19    This is not a case where a parent engaged with the Department but did not make as significant or as timely of gains as the other parent, such that the issue of how best to co-parent would properly be left to the parties in a parenting plan action. Father faults the Department for asserting, through testimony of CPS Pearson at the termination hearing, that it was not only important for Child to have permanency and be settled but it was also important for Mother to feel permanency and be settled. Father asserts it is only Child's interest in permanency and being settled, not Mother's, which the Department should consider. Here though, the evidence suggests Father has negatively impacted Mother's parenting abilities and termination of Father's parenting rights improves Mother's potential to remain a safe, stable parent for Child which is at the heart of Child's permanency. Throughout the case, Father has shown no abilities to work productively with others— Mother, Grandfather, his attorney, service providers, or the Department. Father suffers ongoing emotional dysregulation and substance use issues and has shown no understanding

of how his criminal behavior and lack of progress on his treatment plan have hindered his ability to successfully reunify with Child. Father's historical detrimental interaction with Mother and conduct or conditions rendering him unable to parent—unaddressed mental health issues with ongoing emotional dysregulation, unaddressed substance use issues, and ongoing legal difficulties with intermittent incarceration—combined with his lack of any meaningful progress or insight, support the District Court's findings that the conduct or condition rendering him unfit, unable, or unwilling to parent will not change within a reasonable time and that it is contrary to Child's best interests to maintain the parent-child relationship between Father and Child. As such, Father has not convinced us the District Court either abused its discretion or misinterpreted the law.

## CONCLUSION

¶20 The District Court's failure to obtain written confirmation of Child's enrollment eligibility directly from the Tribe did not constitute reversible error under the facts of this case and its decision to terminate Father's parental rights was not an abuse of discretion.

¶21 Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE